HEALTHCARE ASSOCIATION OF NEW YORK STATE, INC., New York Association of Homes and Services for the Aging, Inc., New York State Health Facilities Association, Inc., NYSARC, Inc. and United Cerebral Palsy Associations of New York State, Inc., Plaintiffs–Appellees,

v.

George E. PATAKI, Governor of the State of New York, Eliot Spitzer, Attorney General of the State of New York and Linda Angello, Commissioner of Labor of the State of New York, Defendants–Appellants.

Docket No. 05–2570–cv.

United States Court of Appeals, Second Circuit.

Argued: Feb. 10, 2006.

Decided: Dec. 5, 2006.

Jeffrey J. Sherrin, Cornelius D. Murray, James A. Shannon, O'Connell and Aronowitz, P.C., for Plaintiffs–Appellees.

Eliot Spitzer, Attorney General of the State of New York, Michelle Aronowitz, Deputy Solicitor General, M. Patricia Smith, Assistant Attorney General in Charge of Labor Bureau, with Seth Kupferberg, Assistant Attorney General, of Counsel, for Defendants–Appellants.

Before: JACOBS, Chief Judge,
WESLEY, and JOHN R. GIBSON,*
Circuit Judges.

Judge WESLEY concurs in a separate opinion.

JOHN R. GIBSON, Circuit Judge.

George E. Pataki, Eliot Spitzer, and Linda Angello, respectively the Governor, Attorney General, and Labor Commissioner of the State of New York, appeal from the district court's grant of summary judg-

---

* The Honorable John R. Gibson, Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

ment to the plaintiff associations[1] in this suit for declaratory and injunctive relief from enforcement of New York Labor Law § 211–a. Section 211–a restricts employers from spending monies derived from the State to hire employees or contractors to attempt to influence union organizing campaigns. The district court held that enforcement of section 211–a is preempted by the National Labor Relations Act, commonly known as the NLRA. We reverse the grant of summary judgment because we conclude that there are disputed issues of fact.

New York Labor Law § 211–a(2)[2] provides: "[N]o monies appropriated by the

1. Healthcare Association of New York State, Inc., New York Association of Homes and Services for the Aging, Inc., New York State Health Facilities Association, Inc., NYSARC, Inc., and United Cerebral Palsy Associations of New York State, Inc.

2. Section 211–a (2002)(as amended 2002 N.Y. Laws c. 601) provides in full:

1. The legislature hereby finds and declares that sound fiscal management requires vigilance to ensure that funds appropriated by the legislature for the purchase of goods and provision of needed services are ultimately expended solely for the purpose for which they were appropriated. The legislature finds and declares that when public funds are appropriated for the purchase of specific goods and/or the provision of needed services, and those funds are instead used to encourage or discourage union organization, the proprietary interests of this state are adversely affected. As a result, the legislature declares that the use of state funds and property to encourage or discourage employees from union organization constitutes a misuse of the public funds and a misapplication of scarce public resources, which should be utilized solely for the public purpose for which they were appropriated.

2. Notwithstanding any other provision of law, no monies appropriated by the state for any purpose shall be used or made available to employers to: (a) train managers, supervisors or other administrative personnel regarding methods to encourage or discourage union organization, or to encourage or discourage an employee from participating in a union organizing drive; (b) hire or pay attorneys, consultants or other contractors to encourage or discourage union organization, or to encourage or discourage an employee from participating in a union organizing drive; or (c) hire employees or pay the salary and other com-

pensation of employees whose principal job duties are to encourage or discourage union organization, or to encourage or discourage an employee from participating in a union organizing drive.

3. Any employer that utilizes funds appropriated by the state and engages in such activities shall maintain, for a period of not less than three years from the date of such activities, financial records, audited as to their validity and accuracy, sufficient to show that state funds were not used to pay for such activities. An employer shall make such financial records available to the state entity that provided such funds and the attorney general within ten business days of receipt of a request from such entity or the attorney general for such records.

4. The attorney general may apply in the name of the people of the state of New York for an order enjoining or restraining the commission or continuance of the alleged violation of this section. In any such proceeding, the court may order the return to the state of the unlawfully expended funds. Further, the court may impose a civil penalty not to exceed one thousand dollars where it has been shown that an employer engaged in a violation of subdivision two of this section; provided, however, that a court may impose a civil penalty not to exceed one thousand dollars or three times the amount of money unlawfully expended, whichever is greater, where it is shown that the employer knowingly engaged in a violation of subdivision two of this section or where the employer previously had been found to have violated subdivision two within the preceding two years. All monies collected pursuant to this section shall be deposited in the state general fund.

5. The commissioner shall promulgate regulations describing the form and content of the financial records required pursuant to this section, and the commissioner shall provide advice and guidance to state entities subject to the provisions of this section

state for any purpose shall be used or made available to employers" to use for three forbidden purposes:

(a) training managers, supervisors or other administrative personnel regarding methods to encourage or discourage union organization or participation in a union organizing drive;

(b) hiring attorneys, consultants or other contractors to encourage or discourage such organization or participation; and

(c) paying employees whose principal job duties are to encourage or discourage such organization or participation.

Subsection 1 of section 211–a memorializes the legislative finding that sound fiscal management requires the state to assure that funds appropriated for the purchase of goods and services are actually expended solely for those goods and services, rather than for the purpose of encouraging or discouraging union organization.

The accounting provision, section 211–a(3), requires "[a]ny employer that utilizes funds appropriated by the state" to maintain for three years financial records sufficient to show that the employer did not spend "state funds" for any of the three restricted purposes.

The enforcement provision, section 211–a(4), empowers the Attorney General of New York to sue for both injunctive relief and the return to the State of monies spent for the three restricted purposes. The Attorney General may also seek a civil

penalty of up to $1000 for a first violation or, for a knowing violation or a second violation within two years, the greater of $1000 or three times the money spent in violation of subsection 2.[3] New York Labor Law § 213 provides that any person who violates any provision of the labor law is guilty of a misdemeanor; however, the State points out that because section 211–a itself prescribes only fines and no jail time, the offense is actually a non-criminal "violation," rather than a misdemeanor, notwithstanding this language in section 213. See N.Y. Penal Law § 55.10.3 ("Any offense defined outside this chapter which is not expressly designated a violation shall be deemed a violation if: (a) Notwithstanding any other designation specified in the law or ordinance defining it, a sentence to a term of imprisonment which is not in excess of fifteen days is provided therein, or the only sentence provided therein is a fine."); see *People v. Star Supermarkets, Inc.*, 67 Misc.2d 483, 324 N.Y.S.2d 514, 516–17 (N.Y. Monroe County Ct.1971) (sabbath-breaking was a "violation," despite specific language in statute terming offense a misdemeanor), *aff'd*, 40 A.D.2d 946, 339 N.Y.S.2d 262 (N.Y.App.Div.1972).

Section 211–a(5) instructs the Commissioner of Labor to promulgate regulations describing the form and content of the financial records required, but the Commissioner has not yet done so.

The plaintiffs are various not-for-profit corporations or trade associations involved in providing healthcare or representing

---

as to the implementation of contractual and administrative measures to enforce the purposes of this section.

**3.** The associations argue that the penalties are worse than they appear; they point to Labor Law § 213, which provides that any person who violates any provision of the labor law shall be punished, "except as in this chapter or in the penal law otherwise provided," by

fines or imprisonment of up to thirty days or sixty days, respectively, for second and third violations. Since section 213 especially defers to statutes for which the punishment is otherwise provided and since section 211–a(4) specifies only civil penalties, the provisions of section 213 do not appear to authorize further punishment.

providers of healthcare. They allege that they or their members receive funds to pay for services rendered, including Medicaid payments, that have at one time been appropriated by New York. In addition to sales of services, they allege that they receive funds from New York to support services they provide, such as training residents and interns and charity health care. Medicaid and other governmental funds represent the great majority of the associations' or their members' income, in some cases making up 90 to 95% of their income.

They further allege that some of the associations are currently undergoing unionization drives or expect to undergo such campaigns in the near future. They allege that "Labor Law § 211–a will encourage union organizing campaigns against Plaintiff Associations because the statute impairs the ability of these employers to communicate with their own employees regarding the benefits and disadvantages of unionization."

The complaint alleges, "The prohibitions of New York Labor Law § 211–a apply to monies the ownership and control of which have already been transferred to the recipient." The associations contend that even after they or their members have provided a service and have been paid for it, the strictures of section 211–a follow the money and prevent the associations and their members from using their own money to communicate with their employees regarding whether it is desirable to unionize. They further allege that monies that they receive from local governments may be considered covered by section 211–a because the local governments received the money from the State: "[T]here is no limitation in the statute as to when in the funding 'chain,' the funds cease to retain and lose their character as state-appropriated monies." They also allege that federal monies are disbursed through the State, so that federal monies are also covered by section 211–a. "It is, therefore, impossible to determine what funds, no matter how tenuously connected to state appropriations, are subject to the prohibitions of section 211–a."

They further allege that the State Attorney General has interpreted section 211–a to restrict their use of Medicaid funds, including the portion of such funds contributed by the federal government. According to the Amended Complaint, the State Attorney General has investigated one or more members of the plaintiff associations for their use of Medicaid funds to oppose unionization.

The associations allege that but for the prohibitions of section 211–a, they would spend proceeds derived from their dealings with the State to pay for the three kinds of expenses restricted by section 211–a.

The associations sought a declaration that section 211–a is preempted by the National Labor Relations Act (the "NLRA") and the Labor Management Relations Disclosure Act and that it violates their First Amendment and Due Process rights.

The three State officials (whom we will call collectively "the State") filed a Fed. R.Civ.P. 12(b)(6) motion to dismiss the complaint, and the associations filed a cross-motion for summary judgment. The State sought to convert its Rule 12(b)(6) motion to a motion for summary judgment, but because the district court viewed the issue as "predominately legal," the court treated both the associations' and the State's motions as motions for judgment on the pleadings, taking into account only those documents that would be considered on a Rule 12(b)(6) motion. *Healthcare Ass'n of New York State, Inc. v. Pataki,* 388 F.Supp.2d 6, 9 (N.D.N.Y.2005).

The district court quite reasonably relied extensively on the Ninth Circuit's decision of a very similar case in *Chamber of Commerce v. Lockyer,* 364 F.3d 1154 (9th Cir.2004). After the district court's decision, the panel in *Lockyer* granted rehearing and issued a superseding opinion, 422 F.3d 973 (9th Cir.2005). The Ninth Circuit then vacated the panel opinion and granted rehearing en banc, 437 F.3d 890 (9th Cir.2006), and has just recently decided that the California statute at issue is not preempted by federal labor law. *Chamber of Commerce v. Lockyer,* 463 F.3d 1076 (9th Cir.2006) (en banc).

The district court held that section 211–a is preempted by the NLRA under the *Machinists*[4] doctrine, under which state laws are preempted if they unsettle the balance of interests between employers, employees and unions established by the NLRA. 388 F.Supp.2d at 12. The district court held that the restrictions section 211–a places on an employer's ability to communicate distort the union organizing process instituted by the NLRA. *Id.* at 23. The court held that the threat of an enforcement proceeding by the Attorney General and of the penalties, including a fine of treble the amount wrongfully spent, would tie employers' hands during union-organizing campaigns, thus depriving employers of an economic weapon the NLRA reserved to them. *Id.* at 24. The record-keeping requirement was also sufficiently onerous to affect employers' ability to communicate as allowed by the NLRA. *Id.* The district court therefore held that section 211–a interferes with the campaign process provided by the NLRA and is preempted under the *Machinists* doctrine. *Id.* at 24–25.

The district court also determined that section 211–a should not be exempt from *Machinists* preemption on the ground that the State is acting as a market participant rather than as regulator. The court held that the broad application of section 211–a, which reaches all employers who receive monies appropriated by the State for any purpose, is not typical of a market participant's efforts to address a specific proprietary problem or project. *Id.* at 17–19. Moreover, notwithstanding the legislative findings announcing that the purpose of section 211–a is to make sure the State gets its money's worth when it pays for goods and services, the district court held that the most prominent effect of the statute is to distort the balance of power in unionization campaigns, rather than to protect the State's spending power. *Id.* at 20.

Because the district court determined that section 211–a is preempted under the *Machinists* doctrine, it did not go on to decide whether it is also preempted or unconstitutional under the other theories raised. *Id.* at 25.

Accordingly, the district court granted the associations' motion, declared section 211–a preempted by the NLRA, and permanently enjoined the State from implementing or enforcing the statute. *Id.*

The State appeals, arguing that section 211–a does not interfere with employers' rights under the NLRA, nor does it deprive employers of economic weapons meant to be left available to them. The State argues that it is entitled to make sure that it gets what it pays for, and because of the complexities of the health-care system, the substantive and accounting requirements of section 211–a are a

---

**4.** *Lodge 76, Int'l Ass'n of Machinists v. Wis. Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976).

reasonable method of making sure that State monies are not misused.

## I.

We begin by addressing the procedural issue of what kind of order we are reviewing. The State initially moved the district court to dismiss the amended complaint under Rule 12(b)(6), and the associations sought summary judgment. The State later asked to convert its motion to one for summary judgment because it had filed a number of evidentiary exhibits that would not properly be before the court on a motion to dismiss, and in particular, the State sought permission to file a number of exhibits after the hearing. The associations opposed the filing of the post-hearing exhibits and opposed the conversion of the motion to dismiss, arguing that they would need discovery in order to respond to a motion for summary judgment. The district court ruled that, because the issues before it were "predominately legal," the court would decide the motions on the pleadings, taking into account only those documents which would be considered in a motion on the pleadings. *Healthcare Ass'n of New York State, Inc. v. Pataki*, 388 F.Supp.2d 6, 9 (N.D.N.Y.2005).

On appeal, the State contends that there are issues of fact that preclude the grant of summary judgment for the associations, and in fact both sides have filed relevant affidavits, which, of course, would not be cognizable on a Rule 12(b)(6) motion. The associations' only motion was for summary judgment and indeed, it would be impossible to treat their motion as one for judgment on the pleadings, since the State has not filed an answer and the pleadings therefore are not closed. *See* Fed.R.Civ.P. 12(c) (motion for judgment on pleadings may be made after pleadings closed). Accordingly, we review the district court's order as the entry of summary judgment for the associations.

We review the district court's grant of summary judgment *de novo*. *Rondout Elec., Inc. v. NYS Dep't of Labor*, 335 F.3d 162, 165 (2d Cir.2003). Summary judgment is only appropriate if there are no genuine issues of material fact and the associations are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## II.

The associations contend that enforcement of section 211–a should be enjoined because the statute is preempted by each of two discrete and complementary theories of preemption under the NLRA. The first, and the older, theory is known as *Garmon* preemption, after *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). *Garmon* preemption addresses actual or arguable conflicts between state law and sections 7 or 8 of the NLRA. *See Bldg. & Constr. Trades Council of the Metro. Dist. v. Assoc. Builders & Contractors*, 507 U.S. 218, 225, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993) ("*Boston Harbor*"). The second type of preemption, *Machinists* preemption, preempts regulations that do not impinge on the protections and prohibitions of sections 7 and 8, but rather interfere with the NLRA's plan to leave certain areas unregulated, whether by the states or even by the NLRB. *Lodge 76, Int'l Ass'n of Machinists v. Wis. Employment Relations Comm'n*, 427 U.S. 132, 146, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976).

In *Garmon*, Justice Frankfurter crafted one broad rule of preemption to serve several kinds of state intrusions on federal labor law, which he enumerated as "potential conflict of rules of law, of remedy, and of administration." 359 U.S. at 242, 79 S.Ct. 773. The danger from the first kind of conflict is that the State will require

different behavior than that prescribed by the NLRA (the substantive concern); the danger from the second is that the State will provide different consequences for the behavior (the remedial concern); and the danger from the third is that Congress's design to entrust labor questions to an expert tribunal—the NLRB—would be defeated by state tribunals exercising jurisdiction over labor questions (the primary jurisdiction concern). To protect against such conflicts, preemption would obviously be required "[w]hen it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8." *Id.* at 244, 79 S.Ct. 773. But *Garmon* extended preemption further: "When an activity is *arguably* subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *Id.* at 245, 79 S.Ct. 773 (emphasis added).

■ Thus, the *Garmon* rule can be stated quite elegantly: "States may not regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits." *Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 286, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986). However, this simple fiat masks the wide variety of cases covered by the *Garmon* rule: cases where the state courts exercised jurisdiction over a state claim involving actions arguably prohibited by the NLRA, *see Garmon*, 359 U.S. at 238–39, 79 S.Ct. 773 (state tort claim preempted even though the NLRB declined jurisdiction over unfair labor practice proceeding); cases in which there were never state court proceedings, but in which a state has adopted a policy that conflicts with federal

labor law, *see Livadas v. Bradshaw*, 512 U.S. 107, 116–117, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994) (state benefit effectively conditioned on employee not being covered by collective bargaining agreement); and cases in which the state regulation does not conflict with, but augments the remedies provided by federal labor law, *Gould*, 475 U.S. at 287–88, 106 S.Ct. 1057 (requiring preemption of state law declining to do business with repeat violators of NLRA because state may not augment sanctions imposed by NLRB).

*Garmon* recognized that the principles it announced were so broad that they would sometimes yield, as where, for instance, the activity regulated was merely peripheral to the federal concerns, or where the states' need to regulate certain conduct was so obvious that one would not infer that Congress meant to displace the states' power. 359 U.S. at 243–44, 79 S.Ct. 773.

Because *Garmon* covers so many different concerns and situations, the one-size fits all remedy can be difficult to administer. In *Sears, Roebuck & Co. v. San Diego County District Council of Carpenters*, 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978), Justice Stevens separated out what Justice Frankfurter had joined, distinguishing the substantive and remedial concerns from the primary jurisdiction concern and prescribing different treatments for each. "The primary-jurisdiction rationale justifies pre-emption only in situations in which an aggrieved party has a reasonable opportunity either to invoke the Board's jurisdiction himself or else to induce his adversary to do so." *Id.* at 201, 98 S.Ct. 1745; *accord Belknap, Inc. v. Hale*, 463 U.S. 491, 510–11, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983). Because the opportunity to invoke the NLRB's jurisdiction depends on bringing an unfair labor practice proceeding, the primary jurisdiction interest will ordinarily be invoked in

cases where the conduct at issue was arguably prohibited by the NLRA. *See Sears, Roebuck*, 436 U.S. at 197, 98 S.Ct. 1745; *see generally* 2 *The Developing Labor Law* 2200–2204 (Hardin et al. eds. 4th ed.2001). Justice Stevens wrote that where the state regulation affects conduct arguably protected by the NLRA, it may be impossible for the party seeking an adjudication to bring the dispute before the NLRB in the form of an unfair labor practice proceeding. *Sears, Roebuck*, 436 U.S. at 201–03, 98 S.Ct. 1745. In such cases, the NLRB's primary jurisdiction will not be in danger. However, where the conduct in issue is arguably protected by the NLRA, there is a substantive Supremacy Clause concern that the state tribunal could restrict or hamper federally protected rights; therefore, the state proceeding or regulation could be preempted even if the controversy is not one which the parties could bring before the NLRB. See 436 U.S. at 199–200, 98 S.Ct. 1745. But where there is no threat to the NLRB's primary jurisdiction, the propriety of preemption depends on "the strength of the argument that § 7 [or here, § 8(c)] does in fact protect the disputed conduct," 436 U.S. at 203, 98 S.Ct. 1745, in other words, whether there is a real danger that state rules will conflict with federal ones. Thus, in *Sears, Roebuck* there was no preemption even though the state court action concerned conduct that was "arguably" protected by section 7, because the argument was not strong enough. 436 U.S. at 207, 98 S.Ct. 1745.

We must therefore begin by identifying whether any specific provision of sections 7 or 8 of the NLRA actually or arguably prohibits or protects the conduct that is the subject of state regulation. Next, we must decide whether the controversy is identical to one that the aggrieved party could bring (or induce its adversary to bring) before the NLRB. If not, the State's action could still be preempted, but only if

there is a strong showing that the State has interfered with the protections offered by section 7 or 8 of the NLRA. Finally, we consider whether the regulated conduct touches interests "deeply rooted in local feeling and responsibility," 359 U.S. at 244, 79 S.Ct. 773, so that the State's action should not be preempted despite affecting conduct "arguably" protected by the NLRA.

### A.

The first step in establishing *Garmon* preemption is to identify which provision of sections 7 or 8 is alleged to protect or prohibit the conduct regulated. *UAW–Labor Employment & Training Corp. v. Chao*, 325 F.3d 360, 364 (D.C.Cir.2003). The associations have no valid claim that section 211–a affects their rights under section 7, since section 7 only confers rights on employees, not on employers. See 29 U.S.C. § 157 (codifying section 7 of NLRA).

The associations' stronger argument is that section 8(c) of the NLRA protects their right to direct non-coercive speech to their employees during the course of a unionization campaign. Section 8(c)(codified at 29 U.S.C. § 158(c)) provides:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

The State contends that section 8(c) does not protect speech because the First Amendment—not the NLRA—is the source of any employer free speech protections in the union organizing context. This view is supported by the Ninth Circuit's

opinion in *Chamber of Commerce v. Lockyer*, 463 F.3d 1076, 1091–92 (9th Cir.2006) (en banc). While we agree that the history of section 8(c) confirms that Congress meant the section to coincide with the First Amendment, this does not mean that section 8(c) is a mere place-holder with no labor law function of its own. The history of the section shows that the contours of the First Amendment in a labor context are intertwined with and shaped by the NLRA rights and restrictions governing the same conduct, and by section 8(c) in particular. The legislative history and subsequent interpretation of section 8(c) demonstrate that the provision was meant to expand speech rights in the labor context; we therefore conclude that section 8(c) itself protects employer speech and that state action impinging on this protection may be preempted under *Garmon*.

The earliest interpretation of the NLRA was that it imposed significant limitations on employer speech. For example, in *International Association of Machinists v. NLRB*, 311 U.S. 72, 78, 61 S.Ct. 83, 85 L.Ed. 50 (1940), the Supreme Court upheld an NLRB decision requiring employers to refrain from making even "[s]light suggestions" of preference for one union over another. The first sign of a change in thinking came in *NLRB v. Virginia Electric & Power Co.*, 314 U.S. 469, 479, 62 S.Ct. 344, 86 L.Ed. 348 (1941), where the Supreme Court reversed an NLRB finding of an unfair labor practice predicated on an employer's speech alone. The Court remanded for the NLRB to take into account surrounding facts that could have made that speech "coercive," which is the standard for an unfair labor practice under section 8(a)(1). *See* 29 U.S.C. §§ 157 & 158(a)(1) (making it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of their section 7 rights). *Virginia Electric* did not mention the First Amendment and appeared to be a pure labor law case. But later, in *Thomas v. Collins*, 323 U.S. 516, 536–37, 65 S.Ct. 315, 89 L.Ed. 430 (1945), the Supreme Court held that the First Amendment protected union speech not protected by the NLRA, and in dicta, stated that *Virginia Electric* had decided

> that employers' attempts to persuade to action with respect to joining or not joining unions are within the First Amendment's guaranty.... When to this persuasion other things are added which bring about coercion, or give it that character, the limit of the right has been passed.... But short of that limit the employer's freedom cannot be impaired.

*Id.* at 537–38, 65 S.Ct. 315. Thus, the Supreme Court crafted a First Amendment standard for labor cases hinging on "coercion," an unfair labor practice concept, rather than using a familiar First Amendment standard from outside the labor context.

In 1947, Congress passed the Taft–Hartley Act, a wide-ranging recalibration of the NLRA, which included free speech protections for both employers and employees. Section 8(c) added the speech clause, which gave a more specific gloss to the concept of "coercive" speech by stating that speech would not be an unfair labor practice unless it contained a threat of reprisal or force or a promise of benefit. *See generally Southwire Co. v. NLRB*, 383 F.2d 235, 241 (5th Cir.1967). The House Conference Report stated that the provision was meant to correct the NLRB's rulings, which were unduly restrictive of employers' speech:

> The practice which the Board has had in the past of using speeches and publications of employers concerning labor organizations and collective bargaining ar-

rangements as evidence, no matter how irrelevant or immaterial, that some later act of the employer had an illegal purpose gave rise to the necessity for this change in the law. The purpose is to protect the right of free speech when what the employer says or writes is not of a threatening nature or does not promise a prohibited favorable discrimination.

H.R.Rep. No. 80–510, at 45 (1947), *reprinted in* 1 NLRB, *Legislative History of the Labor–Management Relations Act, 1947* at 549 (1948). The Supreme Court later acknowledged that "the enactment of § 8(c) manifests a congressional intent to encourage free debate on issues dividing labor and management." *Linn v. United Plant Guard Workers of Am., Local 114,* 383 U.S. 53, 62, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). *Linn* held that state defamation laws would be preempted by federal labor law if the defamation laws did not require malice and injury; otherwise, the defamation laws might allow "unwarranted intrusion upon free discussion envisioned by the [NLRA]." *Id.* at 65, 86 S.Ct. 657. *Linn* may thus be read to affirm that speech rights of both employer and employees play a cognizable role in the NLRA process.[5]

The State and amici argue that section 8(c) added no content to the NLRA, but merely codified the earlier First Amendment cases. As support for this assertion, they quote *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 617, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), in which the Supreme Court decided that certain employer statements could be treated as unfair labor practices notwithstanding section 8(c). *Gissel* stated that section 8(c) "merely im-

plements the First Amendment." *Id.* Cf. 93 Cong. Rec. 3953 (daily ed. Apr. 23, 1947), *reprinted in Legislative History of the Labor–Management Relations Act* at 1011 (remarks of Senator Taft that section 8(c) carried out "approximately" the same rule found in Supreme Court cases). This remark should not be taken out of context, for the Court immediately continued by saying,

> Any assessment of the precise scope of employer expression, of course, must be made in the context of its labor relations setting. Thus, an employer's rights cannot outweigh the equal rights of the employees to associate freely, as those rights are embodied in § 7 and protected by § 8(a)(1) and the proviso to § 8(c).

395 U.S. at 617, 89 S.Ct. 1918. In other words, the employer's entitlement to free speech is not categorical, but limited by the NLRA concept of coercion; to avoid coercion as defined in section 8(c), the NLRB can limit the content of employer speech more severely than would be permissible if the NLRA rights of the employees were not simultaneously affected. *See id.* The interdependence of the First Amendment and the labor laws described in *Gissel* surely refutes the notion that speech rights are not the business of the NLRA and should not be the basis for *Garmon* preemption.

Many courts, including this one, have affirmed that section 8(c) not only protects constitutional speech rights, but also serves a labor law function of allowing employers to present an alternative view and information that a union would not present. "Granting an employer the op-

---

5. *Chao* considered it unclear whether Linn had held that the speech in question was protected by section 8(c) or was prohibited by the NLRA; nevertheless, the D.C. Circuit assumed arguendo that section 8(c) protects the employer's right to speak. 325 F.3d at 364–65. The dissent concluded section 8(c) does protect speech and should therefore provide a basis for *Garmon* preemption. *Id.* at 368–69.

portunity to communicate with its employees does more than affirm its right to freedom of speech; it also aids the workers by allowing them to make informed decisions while also permitting them a reasoned critique of their unions' performance." *NLRB v. Pratt & Whitney Air Craft Div.*, 789 F.2d 121, 134 (2d Cir. 1986). *Accord Steam Press Holdings, Inc. v. Hawaii Teamsters*, 302 F.3d 998, 1009 (9th Cir.2002) ("Collective bargaining will not work, nor will labor disputes be susceptible to resolution, unless both labor and management are able to exercise their right to engage in 'uninhibited, robust, and wide-open' debate.") (citation omitted); *Americare Pine Lodge Nursing & Rehab. Ctr. v. NLRB*, 164 F.3d 867, 875 (4th Cir.1999) ("As the Board has recognized, 'permitting the fullest freedom of expression by each party' nurtures a healthy and stable bargaining process.") (citation omitted). In particular, the employer's speech rights are said to play a role in the unionization campaign context. *NLRB v. Lenkurt Elec. Co.*, 438 F.2d 1102, 1108 (9th Cir.1971) ("It is highly desirable that the employees involved in a union campaign should hear all sides of the question in order that they may exercise the informed and reasoned choice that is their right."); *McGraw–Edison Co. v. NLRB*, 419 F.2d 67, 70 (8th Cir. 1969) (Blackmun, J.) ("recognizing that labor and management, particularly during organizational campaigns, ordinarily 'are allowed great latitude in freedom of expression,'" but holding that employer exceeded even that latitude) (citation omitted); *Southwire Co. v. NLRB*, 383 F.2d 235, 241 (5th Cir.1967) ("The guaranty of freedom of speech and assembly to the employer and to the union goes to the heart of the contest over whether an employee wishes to join a union. It is the employee who is to make the choice and a free flow of information, the good and the bad, informs him as to the choices available."); *see also Beverly Enters., Inc. v. NLRB*, 139 F.3d 135, 140 (2d Cir.1998) (referring to protection under § 8(c) in campaign context); *Kinney Drugs, Inc. v. NLRB*, 74 F.3d 1419, 1428 (2d Cir.1996) (quoting the language from *Pratt & Whitney, supra*, in a campaign context).

The State and amici also argue that section 8(c) does not protect speech because, rather than stating that there is a right to free speech, the section merely states that such speech will not be sanctionable as an unfair labor practice or evidence of one. It is surely a familiar concept that one way of granting rights is to state that the government cannot punish certain conduct. For instance, the First Amendment does not explicitly grant freedom of speech, but instead says that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. Obviously, we interpret the First Amendment as protecting free speech. By the same token, section 8(c) protects employer speech from infringement by the NLRB.

While we have no trouble concluding that section 8(c) protects some speech from restrictions imposed by the NLRB, the question remains whether section 8(c) "protects" the same speech from restrictions imposed by the states. *See Sears, Roebuck*, 436 U.S. at 199–200 n. 30, 98 S.Ct. 1745 (referring to the meaning of "protected conduct" within the *Garmon* doctrine as "conduct which the State may not prohibit"). We may rely on *Linn* in part to answer that question, for in *Linn* a state's libel law was held to be preempted to the extent that it made the union liable for conduct that was protected by section 8(c). 383 U.S. at 65, 86 S.Ct. 657. Moreover, the labor law cases cited above at page 99, affirm the idea that section 8(c) embodies a policy of encouraging free speech in the labor context; such a policy

necessarily entails freedom from state meddling as well as freedom from restriction by the NLRB.

■ The Atelson amici argue that section 8(c) does not confer rights because it only applies in unfair labor practice proceedings, not in representation proceedings, which are governed by the "laboratory conditions" doctrine,[6] see Dal–Tex Optical Co., 137 N.L.R.B. 1782, 1786–87 & n. 11 (1962). It is true that "§ 8(c) was not designed to serve this interest [of encouraging free debate] by immunizing all statements made in the course of a labor controversy." Linn, 383 U.S. at 62 n. 5, 86 S.Ct. 657. Employer speech can still be "protected" from designation as an unfair labor practice, even if the speech has other legal consequences—such as upsetting laboratory conditions. The fact that section 8(c) grants only limited protection for campaign speech does not mean that it gives no protection at all, and the State and amici point to nothing in the Garmon line of authority that suggests that an activity has to be absolutely immunized from all legal effect in order to be "protected" under the NLRA. The legislative history shows Congress amended the NLRA to give the parties freer rein to speak on labor issues, including organizing campaign issues, than they had previously been afforded, though not absolutely free rein. Since this clearly reveals a policy choice by Congress, we must give that choice effect, even if the reform effected was somewhat modest. We therefore conclude that section 8(c) does protect employer speech in the unionization campaign context and can provide a basis for Garmon preemption.

**6.** Under the "laboratory conditions" doctrine, "[c]onduct that creates an atmosphere which renders improbable a free choice will sometimes warrant invalidating an election, even though that conduct may not constitute an

### B.

■ Next, we must determine whether section 211–a threatens the NLRB's primary jurisdiction. Sears, Roebuck declared that the primary jurisdiction rationale "does not extend to cases in which an employer has no acceptable method of invoking, or inducing the Union to invoke, the jurisdiction of the Board." 436 U.S. at 202, 98 S.Ct. 1745. See Building Trades Employers' Ass'n v. McGowan, 311 F.3d 501, 512–13 (2d Cir.2002) (state agency not required to refrain from deciding a labor question in deference to NLRB's primary jurisdiction where such inaction would create an incentive for union not to bring unfair labor practice claim and thus would deprive employer of opportunity to obtain Board determination of question). Here, there is no proceeding pending in a state tribunal, and the associations point to no possible dispute arising under section 211–a that would be identical with an NLRA dispute or over which the State would usurp NLRB jurisdiction. See Stephen F. Befort and Bryan N. Smith, "At the Cutting Edge of Labor Law Preemption: A Critique of Chamber of Commerce v. Lockyer," 20 Lab. Law. 107, 133 (2004) (California statute similar to § 211–a "neither provides an alternative forum for deciding unfair labor practice issues nor imposes an additional remedial scheme in a way that undermines the Board's authority to administer the NLRA."). Indeed, the NLRB "has no authority to address conduct protected by the NLRA against governmental interference." Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 108, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989).

unfair labor practice." General Shoe Corp., 77 NLRB 124, 127, 1948 WL 8168 (1948). See generally 1 The Developing Labor Law 445–47 (Hardin, et al., eds. 4th ed.2001).

The point of extending preemption to conduct only arguably prohibited or protected by the NLRA is a kind of uncertainty principle. When conduct falls generally within the scope of sections 7 or 8, but it would require "precise and closely limited demarcations," *Garmon*, 359 U.S. at 242, 79 S.Ct. 773, to determine on which side of the line the conduct actually falls, then by deciding the question we would move the line itself. It is for the NLRB, not the courts, to draw the close lines, while "[o]ur task is confined to dealing with classes of situations." *Garmon*, 359 U.S. at 242, 79 S.Ct. 773; *see id.* at 244–45, 79 S.Ct. 773. In this case, there is no need for such precision of demarcation, because section 211–a only applies to speech that "encourages or discourages" unionization, and that is clearly the kind of speech addressed by section 8(c). If, for instance, section 211(a) burdened speech only if the speech entailed a "threat of retaliation or force," enforcing the law would require a court to interpret section 8(c) and thus to define the contours of the NLRA. See *Sears, Roebuck*, 436 U.S. at 197–98, 98 S.Ct. 1745. The instant case does not require us to define the contours of section 8(c), and there is thus no basis for preemption to protect the primary jurisdiction of the NLRB.

### C.

Because there is no threat to the NLRB's primary jurisdiction, we turn to the question of whether section 211–a interferes with the substantive provisions of section 8(c) of the NLRA. *See Sears, Roebuck*, 436 U.S. at 203, 98 S.Ct. 1745 ("The danger of state interference with federally protected conduct is the principal concern of the second branch of the *Garmon* doctrine."). The State contends that section 211–a does not infringe on employers' speech rights because a government's refusal to fund speech does not, as a matter of law, constitute interference with that speech.

The State cites *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), and *Regan v. Taxation with Representation*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), cases in which the Supreme Court held that "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." *Regan*, 461 U.S. at 549, 103 S.Ct. 1997. *See United States v. Am. Library Ass'n*, 539 U.S. 194, 212, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003) (plurality opinion) (contrasting a penalty based on exercise of a protected right, which would infringe the right, with a refusal to grant a subsidy to exercise the right, which does not). These cases from outside the labor law context are relevant only by analogy and only to the extent they can be reconciled with *Wisconsin Department of Industry, Labor, and Human Relations v. Gould Inc.*, 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986). There, a Wisconsin statute forbad the State's procurement agents to purchase any product manufactured or sold by a firm that was a repeat violator of the NLRA. The statute fell within *Garmon* preemption because it penalized conduct prohibited by the NLRA. However, Wisconsin contended that the statute should not be preempted because it was "an exercise of the State's spending power rather than its regulatory power." *Id.* at 287, 106 S.Ct. 1057. The Supreme Court dismissed that argument as "a distinction without a difference," because the purpose of the statute was "to deter labor law violations and to reward 'fidelity to the law.'" *Id.* (citation omitted).

The difference between *Rust* and *Gould* is that whereas a government can "make a value judgment favoring" conduct other than exercise of the protected right and

can implement that judgment by allocating public funds in a way that excludes the protected conduct, *Rust*, 500 U.S. at 192–93, 111 S.Ct. 1759 (quoting *Maher v. Roe*, 432 U.S. 464, 474, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977)), a State cannot leverage its money to affect the contractor's protected activity beyond the contractor's dealings with the State. *See Northern Ill. Chapter of Associated Builders & Contractors, Inc. v. Lavin*, 431 F.3d 1004, 1006 (7th Cir.2005) ("Conditions on spending may become regulation if they affect conduct other than the financed project."), *cert. denied*, —— U.S. ——, 127 S.Ct. 347, 166 L.Ed.2d 23 (2006); *Metro. Milwaukee Ass'n of Commerce v. Milwaukee County*, 431 F.3d 277, 279 (7th Cir.2005) (In *Gould* the "state was penalizing contractors for conduct outside the scope of the state's contracts."). The purpose of the statute preempted in *Gould* was to affect the contractors' behavior at all times, lest it come back to haunt them when they bid for a State contract. Our inquiry, then, is whether section 211–a is aimed at making sure that State funds are only spent on the purposes the State has chosen, or whether, instead, the State has used its spending power to restrict the associations' protected speech beyond their dealings with the State.

1.

The associations contend that section 211–a does restrict more than the use of money that belongs to the State, because it also restricts the associations' and their members' use of their own money. In other words, the State is not merely refusing to subsidize, but is restricting the associations' and their members' enjoyment of money they earned by performing contracts that have nothing to do with union campaign costs. Whether the money belongs to the State or to the associations would apparently depend in part on whether the money was given pursuant to a grant, or earned pursuant to a contract.[7] There is evidence in the record of each type of transaction. *Compare* Affidavit of Marc N. Brandt at 6 (referring to application of section 211–a to proceeds for contracts for sale of soap); *with* Amended Complaint at 8 (referring to the associations' receipt of "special funds" to train interns and residents and to offset losses from charity care and bad debts). To the

7. In distinguishing between money that can be said to belong to the State and money that belongs to the employers, our analysis differs from that of both majority and dissent in *Lockyer*, 463 F.3d 1076 (9th Cir.2006) (en banc). The California statutes at issue in *Lockyer* restricted only the use of state grants or funds received through participation in a state "program," an undefined term. Cal. Govt.Code §§ 16645.2 & 16645.7. A claim involving another statutory section, Cal. Govt. Code § 16645.4, which restricted employers' use of proceeds from contracts with the State, was apparently dismissed by the district court pursuant to stipulation and was therefore not before the Ninth Circuit. *See* 463 F.3d at 1080 n. 1 & 1097 n. 22; *see also Chamber of Commerce v. Lockyer*, 225 F.Supp.2d 1199, 1202 (C.D.Cal.2002) (plaintiffs lacked standing to pursue claim), *rev'd on other grounds*, 463 F.3d 1076 (9th Cir.2006) (en banc). The majority of the Ninth Circuit en banc treated both the grant and "program fund" statutes as covering only funds "given" by the State to the employers, which the State had the right to withhold. *See, e.g.*, 463 F.3d at 1097. In contrast, the dissent argued throughout that the statutes (or at least the program fund statute) applied to funds that belonged to the employers. *Id.* at 1098 (the program fund statute "co-opt[ed] the payment for goods and services and profit realized under a contract (undoubtedly not state funds)"). We hold that the New York statute appears to apply both to funds that are gifts of the State and funds that have been earned, that the preemption issue depends on the State's and the employers' respective rights in the funds at issue, and that those rights are determined by the nature of the transaction by which the money changed hands.

extent that section 211–a applies to grant monies (which the employers cannot contend is their own), the associations do not argue that the State cannot specify in advance what a grant may and may not be used for. The dispute thus narrows to whether, when the State agrees to pay a price for goods and services, it may specify how the vendor will use the proceeds of the transaction.

Section 211–a(2) provides that "no monies appropriated by the state for any purpose shall be used or made available to employers" for any of the three forbidden purposes (encouraging or discouraging unionization by training managers, hiring attorneys or consultants, or hiring special employees).

The associations contend that the broad term "monies appropriated by the state for any purpose," section 211–a(2), creates restrictions and obligations when the associations and their members receive payment by the State for goods and services. The Affidavit of Daniel Sisto, president of one plaintiff, Healthcare Association of New York, states: "Medicaid pays for a service rendered." He contends that for the State to dictate what the hospitals can do with the money so earned is analogous to passing a State law that says that State employees may not spend any of their salaries for the advocacy of environmental causes. Similarly, Marc N. Brandt, Executive Director of plaintiff NYSARC, Inc., testified that his organization runs sheltered workshops, in which disabled persons produce goods such as soap that are sold to the State or others. Brandt testified that the "question . . . exists" whether the monies paid for the soap are considered "state-appropriated funds" that cannot be used by NYSARC for the purposes prohibited by section 211–a. If so, the State's asserted rationale of assuring that it gets the services it pays for does not

extend so far—preventing the associations and their members from using their proceeds in a particular way would not save the State any money or guarantee that the State received the goods or services for which it contracted.

The State does not deny the existence of some straightforward fixed-price contracts, but it responds that the Medicare and Medicaid systems are to some extent cost-based, so that if an employer incurs labor costs for opposing unionization, those costs would be included in figuring the rate at which the hospital was paid for services in the future. Consequently, how the associations and their members spend their money affects how much the State will have to pay for subsequent transactions. The associations dispute the assertion that their unionization campaign costs will affect the State's expenses. Sisto testified:

Defendants suggest that the restrictions on spending in section 211–a are consistent with Medicare or Medicaid's not allowing such costs. That is an analogy that is legally and factually false. First, neither Medicare nor Medicaid reimbursement rates for hospitals are cost-based. Hospitals are reimbursed under a case-based prospective payment system. Under this system, a hospital gets paid a set fee based upon the diagnosis and severity of the condition of the patient. Labor-related expenditures are irrelevant to how much reimbursement is received for the patient's care.

Even to the extent that the amount of the case-based rate has any relationship to costs, current hospital Medicaid payment calculations use 1983 costs as the 'base' for determining the payment rate. Thus, the only costs that figure into today's Medicaid payments to hospitals are those incurred 20 years ago.

■ The State responds that current labor costs can affect the price the State

pays, and it cites New York Comp.Codes, Rules, & Regs. tit 10, § 86–1.46(a), under which the most recent two years are the baseline for computing the rates which the State will pay for care provided by community-based home health care agencies. We take it from this patently partial response that the State does not dispute that its obligations to pay under at least some cost-based provisions would not be reduced by prospectively reducing an employer's anti-union campaign costs. At any rate, these conflicting views of the facts may not be resolved on appeal or, indeed, on summary judgment.

Moreover, there would seem to be a vastly simpler and more effective way to make sure that the State does not end up paying labor costs for such activities: the State could simply require such costs to be excluded when setting the price base. Cf. *Milwaukee County*, 431 F.3d at 280–81 (existence of more effective way of addressing problem creates inference that County's actual purpose was to engage in labor regulation). This is the method used in 42 U.S.C. § 1395x(v)(1)(N), which the State contends is equivalent to section 211–a; but § 1395x(v)(1)(N) simply says that such costs will not be reimbursable or will be excluded from the costs on which the price of services is calculated.[8] The associations do not dispute that the State can determine which costs are allowable in a cost-based system. Sisto emphasizes the difference between restrictions on reimbursable costs and restrictions on what can be done with money once it has changed hands:

> This case has absolutely nothing to do with reimbursement rates; it has to do with restrictions on spending. . . .

Expenditures on research are not "allowable" costs for Medicaid reimbursement purposes. That hardly means that the provider is prohibited from spending Medicaid reimbursement on research; rather, such expenditures are encouraged.

App. 463–64. We take this as a concession by the associations that it is not reimbursement restrictions that they object to, but restrictions on use of earned proceeds.

The Brennan Center for Justice and associated amici argue that the complexity of government programs such as Medicare makes it impossible to protect the State's interests by contractual limitations on what the government will pay for:

> The complexity of many government-funded services and the difficulty of measuring concrete outcomes in areas like health care make it difficult to specify (in a contract or grant agreement) performance criteria sufficient to ensure delivery of high quality services and to anticipate all potential abuses. Therefore, a simple contract in which the contractor agrees to deliver certain services for a specific sum of money with "no strings attached" has not proven an effective means of delivering public services.

Brennan Center, et al., Br. at 8. This argument may well be correct, but it poses a question of fact—perhaps a question of expert opinion—that we may not resolve at this procedural stage. Moreover, even if some State expenditures are too complex to monitor performance without something akin to section 211–a, the amici do not deny that section 211–a does cover other straightforward contracts such as contracts for soap, under which the State cannot save money or improve the quality

8. The State cites a number of federal statutes which appear to apply primarily to grant recipients or to limit reimbursable costs. Since the validity of these statutes is not in issue, we will not discuss them individually.

of the merchandise by restricting what the vendor does with its proceeds.

■ We conclude that, to the extent that section 211–a functions as a restriction on what use may be made of State grants, it is not preempted by *Garmon*. To the extent that section 211–a imposes restrictions on the associations' and their members' use of proceeds earned from state contracts and statutory reimbursement obligations in which the contractor's labor costs cannot affect the amount of expense to the State, it attempts to impose limitations on the use of the associations' money rather than the State's; it therefore deters employers from the exercise of their rights under section 8(c) and satisfies the threshold conditions for *Garmon* preemption. To the extent that the State has assumed cost-based obligations that allow contractors to be reimbursed for unionization campaign expenses, the State must demonstrate why it is not feasible for the State to avoid such expenses by designating such costs as non-reimbursable.

### 2.

The associations also contend that in the context of Medicare benefits, section 211–a's language allows the State to restrict employers' section 8(c) activities based on funds originally provided by federal and local governments, but which have merely passed through the State treasury.

Numerous affidavits describe the Medicare system in which every service is paid for by a percentage of federally appropriated money and a percentage of State-appropriated money. Sisto testified:

> Federally-appropriated dollars are deposited in special state accounts to be used exclusively for the Medicaid program. These federal dollars are then re-appropriated by the state, along with the state dollars, to be paid to the locali-

ties in order to support the localities' provision of medical assistance.

He contends that the State operates a claims payment system that processes the payments to providers, so that even local funds are disbursed to the provider by the State. Sisto contends that the State claims section 211–a reaches and regulates an employer's use of monies paid for Medicare services, even the portion actually funded by the federal government and local governments.

■ The affidavit of M. Patricia Smith, the Assistant Attorney General in Charge of the Labor Bureau, indicates that "medicaid funds are subject to the statute." To the extent that section 211–a is interpreted to apply to funds that were originally appropriated by the federal government and only pass through the State en route to the contractors who have earned the funds, it would exceed the State's legitimate interest in controlling the use of its own money. Whether, in the context of providing Medicare and Medicaid services and in the other transactions between the State and the associations and their members, the federal monies truly "pass through" the State or whether they instead are subsidies of State spending decisions, is a question of fact that was not resolved in the district court and which the parties have not addressed in the kind of detail or comprehensiveness that would allow us to render a decision.

Similarly, the application of section 211–a to all Medicaid money would restrict use of monies that were appropriated by local "social services districts." Application of section 211–a to monies appropriated by "social services districts" may or may not be preempted, according to whether that money could be described as State appropriations "passing through" the local districts, which is, again, a question of fact.

Even if the State did not apply section 211–a to funds that originated with federal

and local governments, Sisto contends that it would be impossible for an employer to distinguish between such funds and funds appropriated by the State, since the hospitals receive lump sum payments indicating only the amount for each patient: "Each of these figures represents an ˙amalgam of funds that had originated with the federal, state and local governments. The relative share of federal, state and local percentages are neither known nor disclosed to the provider-recipient." In such a system, putting the burden on the recipient of funds to identify and restrict the use of the State portion of the funds for certain expenses, at peril of ruinous fines, is different and more burdensome than simply refusing to fund certain activities in the first place.

Thus, to the extent that section 211–a burdens the associations' use of federal and local monies that only pass through the State, it would constitute an attempt to regulate labor practices rather than a refusal to subsidize campaign costs. Moreover, even if section 211–a does not apply to federal and local monies, if it places a significant burden on the associations and their members to ascertain what portion of mixed payments are subject to State restrictions, it would burden the associations' and their members' exercise of their NLRA speech rights and would be preempted under *Garmon.*

### 3.

We conclude that there are vital fact issues that must be determined before we can decide whether section 211–a is limited to a restriction on the use of State funds or whether it overreaches in an attempt to regulate the employers' speech regardless of whether State funds are at issue. First, we must know whether the State contends that section 211–a restricts employers' use of funds earned from fixed-price contracts with the State. If so, then section 211–a is broader than necessary to serve the efficiency purpose claimed by the State. Second, if the State maintains cost-based measures that allow reimbursement for unionization campaign expenses, the State must demonstrate why it is not feasible for the State to avoid such expenses by designating such costs as non-reimbursable. Finally, we must know whether section 211–a as applied does indeed create obligations upon receipt of monies that originated with federal and local governments. To the extent that the State applies section 211–a to burden the use of money that cannot be considered State funds, it burdens NLRA speech and satisfies the threshold conditions for *Garmon* preemption.

### D.

Finally, even after concluding that some applications of section 211–a supported by the record would satisfy the threshold for *Garmon* preemption, we must consider whether "the regulated conduct touche[s] interests so deeply rooted in local feeling and responsibility," *Garmon,* 359 U.S. at 244, 79 S.Ct. 773, that the State's action should not be preempted absent a clear indication of Congressional intent to do so.

The State contends that section 211–a "embodies a core state function" of "[e]nsuring state funds are used only for the purpose for which they were appropriated." The associations make three points in response: (1) that section 211–a is overbroad because it attaches restrictions upon money paid for goods and services having nothing to do with unionization campaign expenses; (2) that it is ineffective because even the State's cost-based obligations are based on historic costs rather than current ones and so reducing the employer's costs would not reduce the State's expense; and (3) that it is overbroad because it reaches

not only the State's share of welfare expenditures, but also federal and local governments' shares. These are the same questions that must be resolved in order to determine whether section 211–a restricts the associations' and their member's exercise of their NLRA speech rights, rather than merely refusing to subsidize that exercise. Accordingly, we cannot determine whether the local interest exception should apply without resolution of disputed facts.

### III.

■ The associations contend that section 211–a is also preempted by *Machinists* preemption. Under that doctrine, even regulation that does not actually or arguably conflict with the provisions of sections 7 or 8 of the NLRA may interfere with the open space created by the NLRA for "the free play of economic forces." *Lodge 76, Int'l Ass'n of Machinists v. Wis. Employment Relations Comm'n,* 427 U.S. 132, 140, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976) (quoting *NLRB v. Nash–Finch Co.,* 404 U.S. 138, 144, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971)); *Rondout Elec., Inc. v. NYS Dep't of Labor,* 335 F.3d 162, 167 (2d Cir. 2003). In crafting the NLRA, Congress "struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes." *Machinists,* 427 U.S. at 140 n. 4, 96 S.Ct. 2548 (quoting Archibald Cox, *Labor Law Preemption Revisited,* 85 Harv. L.Rev. 1337, 1352 (1972)). While *Garmon* protects NLRB jurisdiction over the conduct expressly protected and prohibited, *Machinists* preemption concerns conduct that Congress has left to laissez-faire, and it protects it not only against state interference, but even against interference by the NLRB, an important distinction from *Garmon. See id.* at 142–43, 150, 96 S.Ct. 2548.

■ The question in *Machinists* preemption is "whether the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the Act's processes." *Id.* at 147–48, 96 S.Ct. 2548 (internal quotation marks omitted). The associations contend that the NLRA allows employers free speech as a "weapon" to respond to union organizing campaigns and to deprive employers of this "weapon" would alter the balance of power created by Congress.

■ Because *Garmon* preemption applies to conduct that is regulated by the NLRA and *Machinists* preemption applies to conduct the NLRA left unregulated, the two doctrines are conceptually complementary. *See Metro. Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 749, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) (*Machinists* preemption was designed to govern cases that fell outside the reach of *Garmon* ). However, because the protection afforded by section 8(c) is to leave employer speech largely unregulated, in a case involving section 8(c), the *Garmon* doctrine and the *Machinists* doctrine actually tend toward the same point: requiring New York to respect Congress's intent to "leave some activities unregulated," *Machinists,* 427 U.S. at 144, 96 S.Ct. 2548, so that the parties may resolve their disputes by use of the economic weapons left to them. Cf. *Livadas v. Bradshaw,* 512 U.S. 107, 117 n. 11, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994) (difference between conflict preemption and *Machinists* preemption is "entirely semantic"). As we have already discussed, it is well-established that an employer's speech rights do play a role in Congress's design for how employees decide whether a union will represent them. *See* page 99, *supra.* Though we conclude that the *Machinists* doctrine may well require preemption of section 211–a, the ultimate question depends on the same factors we

considered relevant in our *Garmon* discussion: whether section 211–a burdens moneys that cannot properly be said to belong to the State (because they either belong to the contractors or to federal or local governments) and whether the State can accomplish its goal of saving money by limiting the kind of costs for which it will reimburse program participants. These questions in turn depend on disputed facts, which cannot be decided on summary judgment.

The associations also raise an additional *Machinists* argument; they contend that the NLRA allows employers free speech as a "weapon" to respond to union organizing campaigns and to deprive employers of this "weapon" would alter the balance of power created by Congress. The associations contend that by forbidding employers to use "monies appropriated by the state" to train supervisors to speak against unionization, to hire attorneys or consultants in connection with opposing an organizing drive, and to hire employees whose job is to oppose an organizing drive, the State has curtailed the employers' effective use of their right to speak to their employees about unionization. The State contends: "Employers can and do oppose unionization vigorously notwithstanding § 211–a." The State therefore contends that whether section 211–a affects employers' "ability to engage in any activity as a practical matter is disputed" and summary judgment should therefore not have been granted against the State.

We cannot agree that the degree to which the associations are actually able to mount effective campaigns should be determinative of *Machinists* preemption, for this will depend on how each plaintiff has chosen to earn its living. In light of our reasoning in Part II, employers who are entirely dependent on State grants would find themselves with no money to spend on the three prohibited activities, but this would not mean that the State had run afoul of the NLRA. *See Chamber of Commerce v. Lockyer,* 463 F.3d 1076, 1088 (9th Cir.2006) (en banc)("[E]ven if an employer made a business decision to fund its operations entirely through the receipt of state grants, such that the statute effectively prevented that employer from spending any portion of its revenues to advocate during an organization election, that effect would be incidental and solely the consequence of an employer's free-market choice.") Likewise, employers who received a significant amount of money from private sources might be able to wage effective campaigns, but the State might still be improperly restricting their use of monies they have earned from State soap contracts.

We conclude that the answer to the *Machinists* question will depend on the same factors we have identified as determinative in our *Garmon* discussion, Part II.

## IV.

■■■ A major limitation on the labor law preemption doctrines is the principle that state conduct will not be preempted if the state's actions are proprietary, rather than regulatory. *Bldg. & Constr. Trades Council v. Associated Builders & Contractors,* 507 U.S. 218, 226–230, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993) (*"Boston Harbor"*). "In the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction." *Id.* at 231–32, 113 S.Ct. 1190.

The State contends that section 211–a comes within this "market participant" exception to the preemption doctrines. In *Boston Harbor,* a Massachusetts agency

entered a contract requiring all contractors who bid on contracts for the project to abide by certain labor conditions. The Supreme Court held that the agency's action could be characterized as proprietary rather than regulatory because the purpose of the contract was to ensure the timely and economical performance of a cleanup project for which the agency was proprietor, and the challenged action was limited to one particular job. 507 U.S. at 232, 113 S.Ct. 1190.

This reasoning has been reformulated by the Fifth Circuit:

> In distinguishing between proprietary action that is immune from preemption and impermissible attempts to regulate through the spending power, the key under *Boston Harbor* is to focus on two questions. First, does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances? Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem?

*Cardinal Towing & Auto Repair, Inc. v. City of Bedford,* 180 F.3d 686, 693 (5th Cir.1999), *cited in Sprint Spectrum L.P. v. Mills,* 283 F.3d 404, 420 (2d Cir.2002).

The State's articulated concern, getting what it paid for, is a quintessentially proprietary concern and one that any private party would care about as well. *See Bldg. & Constr. Trades Dep't v. Allbaugh,* 295 F.3d 28, 35 (D.C.Cir.2002) ("[T]hat the Government is a lender to or a benefactor of, rather than the owner of, a project is not inconsistent with its acting just as would a private entity; a private lender or benefactor also would be concerned that its financial backing be used efficiently.").

*But see Chamber of Commerce v. Lockyer,* 463 F.3d 1076, 1084 (9th Cir.2006) (en banc) (holding that California statute similar to section 211–a had no proprietary purpose). However, to the extent that section 211–a protects the State's proprietary interests, we have already held in Part II that it would not be subject to *Garmon* preemption. We have held that the statute will only be preempted to the extent that it burdens an employer's use of monies earned from contracts or reimbursement obligations that do not include any costs associated with the three prohibited activities. With regard to such contracts or reimbursement obligations, the State's asserted proprietary interest in saving money is inapplicable. The State cannot save money by burdening the employer's use of contract proceeds, at least not if the State's future obligations cannot be shown to vary according to how the employers spend their money. Similarly, the State cannot save money by burdening the employer's use of monies belonging to federal and local governments, but merely passing through the State as paying agent. The market-participant analysis therefore does not add any element not already taken into account in Part II.

## V.

We hold that material issues of fact made the entry of summary judgment inappropriate on the issues of *Garmon* and *Machinists* preemption. We reverse and remand for further proceedings consistent with this opinion.

WESLEY, Circuit Judge.

I agree with the majority's decision to remand for reconsideration under *Machinists* preemption. I write separately to express my disagreement with the majority's conclusion that *Garmon* applies.

The majority opinion begins its *Garmon* analysis with the proposition that "section 8(c) of the NLRA protects [an employer's] right to direct non-coercive speech to their employees during the course of a unionization campaign." From this proposition, the opinion extrapolates a section 8(c) right for employers to use funds as they please in unionization campaigns. I see no such specific broad protection under section 8(c) that could warrant *Garmon* preemption.

Understanding the mechanics of section 8(c) requires an explanation of the broad protections and prohibitions set forth in sections 7 and 8 of the NLRA. Section 7 authorizes unions to engage in "concerted activities for the purpose of collective bargaining or other mutual aid for protection." 29 U.S.C. § 157. Section 7 also extends protection to employees' concerted labor activities that occur on employer property. Section 8, on the other hand, prohibits several forms of picketing by employees, labeling them "unfair labor practices." *Id.* at § 158(b). Section 8 also prohibits employers from interfering with an employee's section 7 rights. *Id.* at § 158(a). Amidst this array of protections and prohibitions, lies one provision-section 8(c)-with its own history and application.

Section 8(c) addresses a specific problem. Prior to its enactment, the NLRB held that any employer speech expressing disfavor in the unionization process constituted an unfair labor practice. After the Supreme Court's decision in *Thomas v. Collins*, 323 U.S. 516, 536–37, 65 S.Ct. 315, 89 L.Ed. 430 (1945), Congress passed the Taft–Hartley Act, which added section 8(c) to the NLRA. Section 8(c) ensures that employer speech does not constitute evidence of an unfair labor practice so long as the employer speech contains "no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). By negating the possibility of an unfair labor practice suit against an employer who speaks without any threat of reprisal or force or promise of benefit, section 8(c) is best seen as an exception from the broader category of prohibited conduct under section 8(a). In other words, section 8(c) limits the scope of section 8(a)'s prohibition on unfair labor practices by an employer. This serves to protect employer speech from sanction by the NLRB (the goal of the Taft–Hartley Act), rather than to grant to employers the right to fund unionization campaigns without state interference.

For *Garmon* preemption to apply, section 211–a must in some way affect a party's rights or remedies under the NLRA, or in some way affect the NLRB's jurisdiction. Section 211–a does none of these things because an employer does not have a protected right to fund speech under section 8(c). Thus, *Garmon* preemption is inappropriate.

I do not suggest *Garmon* preemption is impossible under section 8(c)-rather, that it is just not appropriate in this case. *Linn v. United Plant Guard Workers of Am., Local 114*, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) provides an example of how *Garmon* could preempt a state law conflict with section 8(c). In *Linn*, the Supreme Court found *Garmon* preemption appropriate for a state libel law that lacked a malice component. The Supreme Court expressed its concern that unless state libel laws required malice, they would frustrate section 8(c) by narrowing the universe of employer speech. The Supreme Court's analysis noted the limited scope of section 8(c): "The wording of the statute indicates ... that section 8(c) was not designed to serve [free debate on issues dividing labor and management] by immunizing *all statements* made in the course of a labor controversy." *Id.* at 62 n. 5, 86 S.Ct. 657 (emphasis added). In

other words, the Court recognized that section 8(c) does not go so far as to create outright protections for employer speech in the labor context. If this had not been the case and Congress had actually immunized employer speech in section 8(c), the Supreme Court in *Linn* would have had a relatively easy task in determining that state libel laws were preempted under *Garmon.*

Let me offer several hypotheticals to show why I believe *Garmon* preemption is inappropriate in this case. The State seeks an accounting by an employer who used state funds to train persons to encourage or discourage union organization. No similar question could possibly arise under the NLRA because section 8(c) offers no protection against allegations of an employer's misuse of funds. Or a case may arise like *Linn,* where a state court has to determine whether an employer was attempting to "encourage or discourage" union organization in violation of section 211–a. But even a determination of whether the employer was encouraging or discouraging union organization does not trigger section 8(c) because it is only concerned with whether such speech is a threat–a much higher threshold than determining whether employer speech encourages or discourages unionization. As a result, I fail to see how *Garmon* works to preempt section 211–a.

Preemption analysis is never easy. For me, the task is made insurmountable when broad protections are read into limited statutory provisions. My point of departure from my two colleagues is not one of semantics; it is a disagreement of focus. I agree with my colleagues that *Machinists* preemption ensures the free exchange of ideas between an employer and its employ-

ees about unionization as a matter of national labor policy. However that conclusion has nothing to do with the rights and remedies under the NLRA, or the jurisdiction of the NLRB. Thus while I agree with my colleague's conclusion, I cannot embrace the entirety of his analysis.